COMMONWEALTH vs. RICHARD C. BENOIT.

Suffolk.   September 10, 1980. — January 6, 1981.

Present: HENNESSEY, C.J., BRAUCHER, WILKINS, LIACOS, & ABRAMS, JJ.

*Search and Seizure.   Constitutional Law,* Search and seizure.   *Evidence,*
     Relevancy and materiality, Scientific test, Nonexistence of evidence.
     *Error,* Harmless.

At the trial of indictments for murder and armed robbery, the admission
     of evidence seized in a search of the defendant's suitcase was reversible
     error, where the existence of probable cause to support the search de-
     pended on statements obtained in violation of the defendant's right to
     counsel secured by the Sixth Amendment to the Federal Constitution,
     where the evidence was seized in violation of the warrant clause of the
     Fourth Amendment, and where, contrary to the Commonwealth's
     contention, the trial judge did not find that the defendant expressly or
     impliedly consented to the search.  [213-215]
Where the Commonwealth contended that the contents of a defendant's
     suitcase, seized by police in violation of his Federal constitutional
     rights, were admissible at his trial on the basis of a demonstration that
     the prosecution would inevitably have discovered them lawfully after
     obtaining a warrant, this court, although not deciding the appli-
     cability generally of an "inevitable discovery" principle, held that such
     a principle was inapplicable where the effect would be to nullify the
     warrant requirement of the Fourth Amendment.  [215-219]
For the contents of a defendant's suitcase to be admissible at his criminal
     trial on the basis that they would inevitably have been discovered in an
     inventory search by police, it must appear that such a search would
     have been conducted for a legitimate police purpose other than a
     search for evidence.  [219-220]
A bloodstained pair of pants illegally seized from a criminal defendant
     was not rendered admissible in evidence at his trial on the theory that
     illegally seized evidence may be used to impeach a defendant who
     elects to testify, where the pants had been admitted as part of the
     Commonwealth's case in chief before the defendant testified; nor did
     the defendant's later attempts to mitigate the effect of the pants render
     them admissible.  [220]
At a trial of indictments for murder and armed robbery, the admission
     in evidence of a bloodstained pair of pants seized in violation of rights

secured to the defendant by the Fourth and Sixth Amendments to the Federal Constitution, followed by argument by the prosecutor that they had been washed in an attempt to remove the stain, was not harmless error. [220]

At a criminal trial, the probative value to be accorded to certain scientific tests of blood stains was for the jury to determine, and the inconclusiveness of the tests did not render them inadmissible. [220-221]

At a criminal trial, evidence of failure of the Commonwealth to conduct particular scientific tests and of inadequacies of the tests performed is relevant and admissible. [221]

INDICTMENTS found and returned in the Superior Court Department on November 16, 1978, and February 15, 1979, respectively.

Pretrial motions to suppress evidence were heard by *Brogna*, J., and the cases were tried before him.

*Thomas E. Finnerty (James M. McDonough* with him) for the defendant.

*Sharon D. Meyers*, Special Assistant District Attorney (*Jeremiah P. Sullivan, Jr.*, Assistant District Attorney, with her) for the Commonwealth.

LIACOS, J. The defendant, Richard C. Benoit, was tried before a jury and convicted of murder in the first degree and armed robbery. He was sentenced to serve two concurrent terms of life imprisonment. He appeals from these convictions pursuant to G. L. c. 278, §§ 33A-33G, and claims error on a number of grounds. We agree with the defendant's contention that the trial judge improperly denied his motion to suppress certain physical evidence, and that the admission of such evidence was not harmless error. We reverse and order a new trial.

We summarize the facts. On November 13, 1978, the body of Mary Ballard was discovered in a Revere motel room registered to the defendant. The decedent had been bludgeoned to death with a wine bottle. Her car and some personal effects were missing. As a result of a police investigation the defendant, whose whereabouts were then unknown, was indicted for murder and armed robbery.

On December 8, 1978, two Hartford policemen discovered the defendant sleeping in the cab of a tow truck

behind a gasoline station in Hartford, Connecticut, near the location where Mary Ballard's missing car had been found. They arrested the defendant. They also seized his suitcase, which was on the floor of the truck's cab. The Hartford police conducted an inventory search of the suitcase at the police station. Nothing was seized from the suitcase at this time.

The defendant admitted to Hartford police that he and Mary Ballard had been together during the evening and night prior to the murder; that they had met in a bar near his motel and later returned to the motel where they had intercourse; and that after the victim had fallen asleep he left, stealing her pocketbook and her car. He denied having murdered her, or harmed her in any way.

Two Massachusetts State police officers, Lieutenant Sharkey and Trooper Schofield, and a Revere police officer, Lieutenant Ryan, arrived in Hartford on December 8. On December 11, 1978, the defendant, who was represented by appointed counsel, voluntarily waived extradition at a preliminary hearing and agreed to return to Massachusetts. The Hartford police surrendered custody of the defendant to Lieutenant Sharkey in the court room. At this time the defendant's appointed counsel stated directly to Lieutenant Sharkey, in the presence of the judge, that it was the defendant's wish that he not be questioned until he had counsel to represent him.

The defendant's suitcase had been left at the jail in Hartford during the preliminary hearing. At the defendant's request the Massachusetts police officers drove back to the jail to retrieve it. They placed it in the trunk of the police cruiser.

Immediately prior to and twice during the return trip Lieutenant Sharkey advised the defendant of his Miranda rights. During the trip Lieutenant Sharkey and the defendant engaged in conversation, initially "small talk." At one point Lieutenant Sharkey observed that there had been an in-depth investigation and that they had a "very good case" against the defendant. Lieutenant Sharkey told the

defendant that a bartender who had seen him with Mary Ballard in a bar on the night of the murder described him as wearing a light tan pair of chino pants. The defendant admitted owning a pair of pants of that description. He told the lieutenant that they were in the suitcase in the trunk of the police cruiser. He denied having worn them on the night of the murder. Lieutenant Sharkey told the defendant that he wanted to take the suitcase to perform blood tests and laboratory analysis of its contents. The defendant responded, "I understand." At the Charles Street jail in Boston the police, allegedly having obtained the defendant's consent, opened and searched the suitcase. They seized the tan pants and other articles of clothing.

The defendant filed a motion to suppress various statements he made during the period from the time he was arrested in Connecticut until he was booked in Massachusetts. Also, he filed motions to suppress physical evidence seized by the police, including the contents of his suitcase. The motion to suppress the contents of the suitcase was based upon the failure of the police to obtain a search warrant prior to opening the suitcase.

The trial judge ruled that the conversation during the return trip from Hartford violated the defendant's Sixth Amendment right to counsel under the rule of *Massiah* v. *United States*, 377 U.S. 201 (1964). See *Brewer* v. *Williams*, 430 U.S. 387 (1977). The defendant's statements made during the trip were therefore suppressed. The judge ruled, however, that the pants and other articles in the suitcase would not be suppressed because they would have been "inevitably discovered anyway."

1. *The motion to suppress the contents of the suitcase.* Implicit in the judge's ruling on the motion to suppress the contents of the suitcase is the premise that statements obtained in violation of a defendant's right to counsel under the Sixth Amendment to the United States Constitution may not be used for the purpose of establishing probable cause sufficient to validate a subsequent search. We agree with this premise. In *Commonwealth* v. *White*, 374 Mass. 132,

138-139 (1977), aff'd by an equally divided court, 439 U.S. 280 (1978), we held that statements obtained in violation of a defendant's Fifth Amendment right against self-incrimination could not be used to establish probable cause sufficient to obtain a valid search warrant. We observed in *White* that the policies underlying the "fruit of the poisonous tree" doctrine in the search and seizure area may be even more compelling in the Fifth Amendment context. *Id.* at 139. The reasons underlying our holding in *White* are equally applicable in the context of a Sixth Amendment violation.

In addition, the contents seized from the suitcase are the product of a second illegality. We agree with the defendant's contention that the failure of the police to obtain a warrant prior to searching the suitcase was a violation of the warrant clause of the Fourth Amendment. The Supreme Court has clearly established that police must obtain a warrant prior to executing an evidence search of closed luggage once they have seized the luggage and reduced it to their exclusive control. See *Arkansas* v. *Sanders*, 442 U.S. 753 (1979); *United States* v. *Chadwick*, 433 U.S. 1 (1977).

The Commonwealth argues that "[i]n effect, the court found an implied consent to search when the defendant requested the officers to look through his suitcase," and that the defendant's implied consent "led to the inevitable discovery of his pants." However, the judge made no finding that the defendant requested the officers to look through his suitcase; nor is there any suggestion in the judge's ruling that he found an implied consent.[1]

---

[1] The ruling of the trial judge on this question is as follows: "Now, although I have suppressed the conversation on the way up between the defendant and Lieutenant Sharkey as being a violation of the rule in *United States* vs. *Massiah*, and although it was indicated by Lieutenant Sharkey that reference was made to the pants that were in the suitcase by the defendant on the way up, I find that even if the seizure of the pants and the other articles in the suitcase would have been illegal under the fruit of the poisonous tree doctrine, that there is an exception to that doctrine and that that is if the articles would have been inevitably discovered anyway,

We have repeatedly stated that we will not disturb subsidiary findings of fact made by a trial judge unless they are clearly erroneous. See, e.g., *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980), and cases cited. We cannot say on this record that the judge erred in not finding that the defendant voluntarily consented to the search of his suitcase.[2]

It is possible to surmise that the police may have failed to obtain a warrant in reliance on a mistaken belief that they had obtained a valid consent to search from the defendant. However, the import of the judge's ruling is not that there was a consensual search, but rather that — even had the illegal conversations not taken place — the police in the normal course of their investigation would have inevitably discovered the contents of the suitcase by virtue of information obtained independent of the *Massiah* violation.

We disagree with the judge's conclusion that the illegally seized contents of the suitcase were rendered admissible on the basis of inevitable discovery. The Supreme Court has

---

without the conversation in the car, that there is no need to suppress the taking of them. I find here that where the officers knew the type of pants that they were looking for from the previous description obtained from the bartender that at some time it was inevitable that the suitcase would be opened by the police in Massachusetts for inspection purposes and a detailed inspection made as opposed to a cursory, that apparently Trooper Schofield made when they picked up the suitcase in Hartford, that it would have been inevitable that the police would have discovered the trousers, anyway, in the process of a lawful search of the suitcase prior to storing it in the jail.

"I therefore deny your motion to suppress the articles of clothing."

[2] The issue of consent was clearly raised and argued below. Significantly, the trial judge assumes in his ruling that the seizure of the pants would have been illegal under the fruit of the poisonous tree doctrine. Considered in light of the whole record it is apparent that the judge's ruling reflects his view that the connection between the *Massiah* violation and any subsequent consent is not so attenuated as to dissipate the taint. This issue is thus foreclosed in the event of a new trial. In any event the Commonwealth makes no argument on appeal with regard to this aspect of the fruit of the poisonous tree doctrine. Therefore, the issue of consent is deemed waived. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975).

recognized two exceptions to the fruit of the poisonous tree doctrine. Evidence is not excluded under the doctrine if (1) the government obtained it through an independent source, *Silverthorne Lumber Co.* v. *United States*, 251 U.S. 385, 392 (1920), or (2) the "connection [between the improper conduct and the derivative evidence has] become so attenuated as to dissipate the taint," *Nardone* v. *United States*, 308 U.S. 338, 341 (1939). See *Wong Sun* v. *United States*, 371 U.S. 471, 487 (1963) (expressly recognizing and citing the independent source test of *Silverthorne* and the attenuated basis test of *Nardone*). These exceptions allow removal of the taint if the government can demonstrate that the improper official conduct was not a sine qua non or "but for" cause of the discovery of the evidence. See *People* v. *Fitzpatrick*, 32 N.Y.2d 499, cert. denied, 414 U.S. 1033, 1050 (1973); *Harrison* v. *United States*, 392 U.S. 219, 225 (1968); Maguire, How to Unpoison the Fruit — The Fourth Amendment and the Exclusionary Rule, 55 J. Crim. L.C. & P.S. 307 (1964); Note, The Inevitable Discovery Exception to the Constitutional Exclusionary Rules, 74 Colum. L. Rev. 88, 90 (1974). Neither of these exceptions was relied on by the judge, nor are they applicable to the facts of this case.

The attenuated basis exception is justified when the deterrence rationale is outweighed by the competing societal interest in convicting the guilty. See 3 W.R. LaFave, Search and Seizure § 11.4, at 614 (1978). "The notion of the 'dissipation of the taint' attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." *Brown* v. *Illinois*, 422 U.S. 590, 609 (1975) (Powell, J., concurring in part). This requires a case-by-case balancing approach.

In contrast, "the exclusionary rule has no application" when "the Government learned of the evidence 'from an independent source.'" *Wong Sun* v. *United States, supra* at 487, quoting from *Silverthorne Lumber Co.* v. *United States, supra* at 392. Such evidence is not, strictly speaking,

fruit of the constitutional violation. See LaFave, *supra* at 617. Thus, under this exception no balancing test is required.

Although not expressly sanctioned by the Supreme Court, the "inevitable discovery" rule has been used by some courts as a third exception to the exclusionary rule. Language in recent Supreme Court opinions may imply the Court's approval of the rule. See, e.g., *United States* v. *Crews*, 445 U.S. 463, 469-470 & n.11 (1980); *United States* v. *Ceccolini*, 435 U.S. 268, 273 (1978), *id.* at 287 (Marshall, J., dissenting); *Brewer* v. *Williams*, 430 U.S. 387, 406-407 n.12 (1977). See also *United States* v. *Brookins*, 614 F.2d 1037 (5th Cir. 1980) (relying on such language in declining to follow prior express rejections of the rule by the Fifth Circuit Court of Appeals).

Under the "inevitable discovery" rule, evidence that is the fruit of the poisonous tree is not rendered inadmissible if the government can demonstrate that it would have inevitably discovered the evidence lawfully. The rule has been characterized as a "conceptual extension" of the "strict" independent source rule of *Wong Sun*. LaCount & Girese, The "Inevitable Discovery" Rule, An Evolving Exception to the Constitutional Exclusionary Rule, 40 Alb. L. Rev. 483, 485-486 (1976). See Note, 74 Colum. L. Rev., *supra* at 90; LaFave, *supra* at 620-621. The significant difference between the tests is that under the independent source rule the inquiry is whether the government did in fact acquire certain evidence through an untainted source, while under the inevitable discovery rule the inquiry is whether evidence found because of a constitutional violation would inevitably have been discovered lawfully. See LaFave, *supra* at 621.

Although the majority of Federal appellate courts which have considered the "inevitable discovery" rule have expressly or implicitly accepted the test as legitimate, see, e.g., *United States* v. *Bienvenue*, 632 F.2d 910 (1st Cir. 1980); *United States* v. *Brookins, supra*; *United States* v. *Schmidt*, 573 F.2d 1057, 1065-1066 n.9 (9th Cir.), cert. denied, 439 U.S. 881 (1978); *United States ex rel. Owens* v.

*Twomey*, 508 F.2d 858, 865-866 (7th Cir. 1974); *Government of the V.I.* v. *Gereau*, 502 F.2d 914, 927-928 (3d Cir. 1974), cert. denied, 420 U.S. 909 (1975); *United States* v. *Falley*, 489 F.2d 33, 40-41 (2d Cir. 1973); *Wayne* v. *United States*, 318 F.2d 205, 209 (D.C. Cir.), cert. denied, 375 U.S. 860 (1963) (Burger, J., now Burger, C.J.), the rule has not gone free from criticism, *United States* v. *Hoffman*, 607 F.2d 280, 285 n.3 (9th Cir. 1979); see, e.g., *United States* v. *Castellana*, 488 F.2d 65 (5th Cir.), aff'd in part, rev'd in part, 500 F.2d 325 (5th Cir. 1974); *United States* v. *Paroutian*, 299 F.2d 486, 489 (2d Cir. 1962). See generally, LaFave, *supra* at 622-624.

The major concern of the critics is that the rule "collides with the fundamental [deterrent] purpose of the exclusionary rule," Pitler, "The Fruit of the Poisonous Tree" Revisited and Shepardized, 56 Calif. L. Rev. 579, 630 (1968), and that the rule will encourage police shortcuts since "the illegal route is often faster and easier than the legally required route," Comment, Fruit of the Poisonous Tree — A Plea for Relevant Criteria, 115 U. Pa. L. Rev. 1136, 1143 (1967). See Note, 74 Colum. L. Rev., *supra* at 99.

We need not decide today whether we accept the "inevitable discovery" rule for, in any event, we would not apply the rule in this case. We assume for the purpose of our analysis that proper application of the rule would cure the taint from the *Massiah* violation, and that in the absence of any further illegality, the contents of the suitcase would be admissible. We observe that although the "inevitable discovery" rule has most frequently been applied to derivative evidence, see LaCount & Girese, *supra* at 507, the doctrine has also been applied to primary evidence, see, e.g., *Clough* v. *State*, 92 Nev. 603 (1976) (inevitable inventory search rationale used); but see, e.g., *State* v. *Crossen*, 21 Or. App. 835 (1975) (rejecting the use of the doctrine as to primary evidence). Without suggesting whether we would apply the "inevitable discovery" rule, if adopted, to primary evidence, we decline to apply the rule in a situation where its effect would be to read out of the Constitution the require-

ment that the police follow certain protective procedures — in this case, the warrant requirement of the Fourth Amendment. See *United States* v. *Griffin,* 502 F.2d 959 (6th Cir.), cert. denied, 419 U.S. 1050 (1974); LaFave, *supra* at 624. We can find no authority for applying the "inevitable discovery" rule to cure an illegal warrantless search on the basis that it was inevitable that a warrant would be obtained.

The Commonwealth makes no argument that the seizure of the pants from the suitcase can be justified on the basis of an inevitable inventory search by Massachusetts police. An inventory search may be lawful absent a warrant. *Commonwealth* v. *White,* 374 Mass. 132, 140 (1977). To the extent the Commonwealth addresses this question, it focuses on an alleged inventory search which took place in Hartford. We note first that the trial judge did not justify the seizure of the pants on that basis. Second, to the extent his ruling may be viewed as contemplating "inevitable discovery" by an inventory search by Massachusetts police, there is no evidence of justification for such a limited search in Massachusetts. If a warrantless search is to be recognized as a lawful inventory search, there must be at least a showing that it was conducted for some legitimate police purpose other than a search for evidence. There is no showing here that a search of the suitcase in Massachusetts was, or could be, justified in order to safeguard the defendant's property, to insulate police against later claims of theft or lost property, to protect the safety of the police or others, or otherwise. See *Commonwealth* v. *White, supra; South Dakota* v. *Opperman,* 428 U.S. 364 (1976); *Cady* v. *Dombrowski,* 413 U.S. 433 (1973). Compare *Commonwealth* v. *Ross,* 361 Mass. 665 (1972), judgment vacated, 410 U.S. 901, aff'd on rehearing, 363 Mass. 665, cert. denied, 414 U.S. 1080 (1973). The record clearly reveals that the only purpose for the entry into this suitcase in Massachusetts was to seize evidence. The search and seizure without a warrant was, therefore, illegal. Cf. *Arkansas* v. *Sanders,* 442 U.S. 753 (1979); *United States* v. *Chadwick,* 433 U.S. 1 (1977);

*Commonwealth* v. *Moon*, 8 Mass. App. Ct. 375, 382 (1979).

The Commonwealth argues that the tan pants are nevertheless admissible under the theory that illegally seized evidence may be used to impeach a defendant who elects to testify. See *United States* v. *Havens*, 446 U.S. 620 (1980). At trial, the defendant testified, in contradiction to the testimony of at least one prosecution witness, that he did not wear the tan pants on the night of the murder. Contrary to the Commonwealth's contention, however, the pants were not initially introduced to impeach the defendant. The Commonwealth initially introduced the pants through its own expert witness as part of its case in chief before the defendant even took the stand. At this time the blood stain was pointed out to the jury. We do not subscribe to the bootstrap argument that the defendant's apparent attempt to mitigate the effect of the already improperly admitted evidence may be used to render the evidence admissible.

Finally, we cannot say that the admission in evidence of the tan pants amounted to harmless error. The unexplained blood on the pants crucially linked the defendant to the murder scene at the time of the murder. This factor alone requires reversal. The Commonwealth also used the pants to show guilty conduct on the part of the defendant by arguing to the jury that they had been washed after the murder in an apparent attempt to remove the blood stain.

For the foregoing reasons we conclude that it was error to admit in evidence any items seized from the defendant's suitcase, and that in any retrial of the defendant on these charges all such items must be suppressed.

2. *Motion to suppress physical evidence and results of scientific tests.* We briefly consider, for the purpose of guidance in the event of a new trial, the defendant's exception to the trial judge's rulings denying the defendant's motion to suppress certain bloodstained real evidence and the results of scientific tests. The items of evidence involved in this regard include objects from the scene of the crime in addition to those taken from the defendant's suitcase.

The defendant based this motion on the Common-wealth's several months' delay in testing the bloodstained articles. All the blood was found to be of type O. Both the defendant and the victim, as well as a large segment of the world population, have type O blood. The age of the blood, advanced by the Commonwealth's delay, precluded further identification tests that might have tended to ex-culpate the defendant. The judge found that the Com-monwealth was not at fault for the delay.

The defendant argues that the test results are inconclusive and highly prejudicial and that therefore these results, as well as the bloodstained objects, should be suppressed. We disagree. Evidence is not rendered prejudicial merely be-cause it is inconclusive. It is axiomatic that it is for the jury to determine the probative value to be accorded relevant evidence. We see no reason to deviate from this rule in this case. There was no error in this ruling.

3. *Evidentiary ruling.* The defendant argues that the judge erred by precluding the defendant from cross-exam-ining the Commonwealth's expert witness on the failure to conduct certain scientific tests. Without deciding whether the judge abused his discretion to limit the scope of cross-examination in this case, we note that the failure of the Commonwealth to conduct certain tests is a permissible ground on which to build a defense. See *Commonwealth* v. *Bowden,* 379 Mass. 472, 485-486 (1980). Evidence of in-adequacies in the tests performed by the Commonwealth, and of the existence of more reliable tests, is relevant and admissible. *Commonwealth* v. *Rodriguez,* 378 Mass. 296, 308 (1979).

*Judgments reversed.*

*Verdicts set aside.*