NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

22-P-387                                        Appeals Court


COMMONWEALTH  vs.  SCOTT RODRIGUES.


No. 22-P-387.

Bristol.     January 3, 2024. – July 11, 2024.

Present:  Green, C.J., Walsh, & Smyth, JJ.


Homicide.  Constitutional Law, Admissions and confessions,
     Arrest, Result of illegal interrogation, Harmless error.
     Due Process of Law, Police custody.  Evidence, Result of
     illegal interrogation, Admissions and confessions.  Arrest.
     Error, Harmless.  Practice, Criminal, Motion to suppress,
     Admissions and confessions, Harmless error, Argument by
     prosecutor.



     Indictment found and returned in the Superior Court
Department on November 16, 2017.

     Pretrial motions to suppress evidence were heard by Thomas
F. McGuire, Jr., J., and the case was tried before Renee P.
Dupuis, J.


     David J. Nathanson (Melissa Ramos also present) for the
defendant.
     Stephen C. Nadeau, Jr., Assistant District Attorney, for
the Commonwealth.


     GREEN, C.J.  Following a jury trial in the Superior Court,

the defendant, Scott Rodrigues, was convicted of murder in the

second degree in connection with the death of Dennis Cousineau. On appeal, the defendant principally challenges the denial of his motions to suppress statements and certain evidence obtained from him by police on the night of the incident.[1] We agree with the defendant that his motions to suppress should have been allowed, and vacate the conviction.

Background. We summarize the facts found by the motion judge, supplemented by uncontested testimony, implicitly credited by the judge, from the evidentiary hearing held on the defendant's pretrial motion to suppress.[2] See Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015).

At approximately 11:30 P.M. on October 1, 2017, Officer Raul Camara was on patrol in Fall River and observed the victim lying on the sidewalk at the corner of Bedford and Albion Streets. The victim had blood on his face and was having difficulty breathing. Officer Camara called for backup and an ambulance.[3] A woman nearby told Officer Camara that there had been a fight and that the people involved ran up Albion Street.

---

[1] The defendant also claims error in the trial judge's jury instruction on humane practice and asserts that the prosecutor made an improper closing argument.

[2] The evidence adduced at trial was consistent with our summary, for purposes of our brief discussion of the defendant's claims arising from the trial.

[3] The victim was transported to the hospital and died days later from blunt force head injuries.

Officer Camara heard people arguing a few houses away on Albion Street and ran toward them with another officer who arrived on the scene.

As the officers approached the group, they saw two men (one of whom was later identified as the defendant) and two women arguing about kicking a door. The officers drew their tasers and called out, "Police! Police!" They then heard a metallic sound and saw knives dropped on the pavement near the men. A third officer arrived to assist, and the officers separated the parties. As the defendant and one of the women, Mendi Perry, refused to stop arguing, the officers told the defendant to "shut up," pushed him aside, and then handcuffed the defendant and Perry and moved them down the street away from the other two individuals. In handcuffs, the defendant and Perry were seated on the curb of a sidewalk.

After speaking with the other two individuals for ten to fifteen minutes, Officer Camara spoke with the defendant and Perry for another ten to fifteen minutes.[4] Officer Camara asked the defendant why he had been running and why he was kicking the door. The defendant responded that he was not kicking a door, and that he was running back to his friend's house (where he had

---

[4] Officer Camara testified on direct examination that he spoke with the defendant and Perry for ten to fifteen minutes. On cross-examination, Officer Camara testified that his interview of the defendant lasted no longer than five minutes.

been earlier in the evening) to call the police, because he saw the victim on the ground and a man and a woman running west on Bedford Street.  When Officer Camara asked if either of the knives on the ground belonged to him, the defendant replied that the steak knife was his.  Using his flashlight, Officer Camara observed blood on the defendant's sneakers and asked where the blood came from.  The defendant said that he had cut himself earlier and that it was his own blood.

Officer Camara then went to the apartment of the defendant's friend and spoke with him for ten to fifteen minutes.  The defendant's friend reported that the defendant and Perry were at his apartment that day.  The defendant's friend also identified the steak knife outside as his knife.

Officer Camara then returned to the sidewalk, where the defendant remained seated and handcuffed, and asked him more questions.  When Officer Camara stated that he did not believe the defendant's story about the sneakers, the defendant responded, "I know what you're thinking but that's my blood, not his blood."  Officer Camara said, "I don't believe your story.  Give me your sneakers, then.  If you're telling me it's not your blood -- if it's your blood and nobody else's blood, then give me your sneakers."[5]  The defendant responded, "If you don't

_____

[5] Later in his testimony, Officer Camara offered a slightly different description of his phrasing:  "I said, 'Okay.  Now I

believe me, take the sneakers."  The defendant then kicked the sneakers off his feet, and Officer Camara took them.  After the officers uncuffed Perry and she retrieved another pair of sneakers for the defendant from his friend's apartment, the officers uncuffed the defendant and allowed both the defendant and Perry to leave.  Deoxyribonucleic acid (DNA) testing revealed that the victim's blood matched the blood found on the defendant's sneakers.  The defendant was subsequently charged with murder.

Discussion.  1.  Motions to suppress.  The defendant claims that the motion judge erred in denying his motions to suppress (1) his statements to the police on the night of the incident and (2) the sneakers the police obtained from him.  "In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error but conduct an independent review of his ultimate findings and conclusions of law" (quotation and citation omitted).  Commonwealth v. Scott, 440 Mass. 642, 646 (2004).

a.  Statements.  The defendant argues that his statements to Officer Camara should have been suppressed because Officer Camara questioned him while he was in custody without giving him Miranda warnings.  We agree.

---

think you're full of crap.  Give me your sneakers.'  And he says okay, sure."

"It is well settled that Miranda warnings are necessary only when a defendant is subject to custodial interrogation, . . . and that it is the defendant's burden to prove custody" (citations omitted).  Commonwealth v. Vellucci, 98 Mass. App. Ct. 274, 277 (2020).  In determining whether the defendant was in custody for Miranda purposes, we consider:

> "(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest."

Commonwealth v. Groome, 435 Mass. 201, 211-212 (2001).  "The Groome factors merely provide a framework for assessing the ultimate question:  whether the defendant was subjected to a formal arrest or restraint of freedom of movement of the degree associated with a formal arrest" (quotations and citation omitted).  Commonwealth v. Earl, 102 Mass. App. Ct. 664, 671 (2023).

Unlike the motion judge, we conclude that the defendant's freedom of movement was curtailed to the extent associated with a formal arrest.  "Placing a suspect in handcuffs is usually considered a physical restraint on freedom tantamount to arrest."  Earl, 102 Mass. App. Ct. at 675.  It is true that

"[i]t is not dispositive that the defendant was handcuffed."
Id., quoting Commonwealth v. Williams, 422 Mass. 111, 118
(1996).  However, in the present case, as in Earl, "the evidence
did not suggest, nor did the [motion] judge find, that the
officers were in any danger or that the defendant presented a
threat to public safety that might excuse the failure to give
Miranda warnings."[6]  Id. at 676.

Other conditions of the encounter support a conclusion that
the defendant was in custody.  The officers approached the
defendant with tasers, ordered him to "shut up," pushed him
aside, and handcuffed him when he refused to stop arguing with
Perry.  The defendant then remained handcuffed, seated on the
curb of a sidewalk, for thirty to forty-five minutes.[7]  In these

---

[6] Officer Camara testified that the officers handcuffed the
defendant partly due to safety concerns as they had seen knives
(though the defendant was not in possession of a knife).  Though
the officers observed knives next to the defendant and the other
man with him, they handcuffed only the defendant.  The motion
judge found only that the officers handcuffed the defendant
because the defendant refused to stop arguing with Perry.

[7] At the suppression hearing, Officer Camara testified that
he spoke for ten to fifteen minutes with (1) the other two
individuals who were with the defendant and Perry, (2) the
defendant and Perry, and (3) the defendant's friend, before
speaking with the defendant again.  The defendant was uncuffed
only after Officer Camara completed all these interviews and
allowed Perry to retrieve another pair of sneakers for the
defendant.  At oral argument, the Commonwealth agreed that the
defendant was handcuffed sitting on the curb for at least thirty
minutes before he kicked off his sneakers.

circumstances, as in Earl, "it is obvious that a reasonable person in the defendant's position would have experienced the interaction as coercive." Id. See id. at 671 (officers chasing, tackling, handcuffing, and pat frisking defendant before seating him by side of road for questioning was coercive).

Consideration of the Groome factors further supports our view that the officers' detention of the defendant was custodial. Though the questioning occurred on a public street, "[f]rom the defendant's point of view, the officers' actions objectively created a coercive and police-dominated environment, even if it was not in a police station." Earl, 102 Mass. App. Ct. at 673. Officer Camara's pointed questions to the defendant conveyed that he suspected the defendant of wrongdoing.[8] Compare Commonwealth v. Tantillo, 103 Mass. App. Ct. 20, 24 (2023) ("An open-ended preliminary question such as 'What happened?' does not convey suspicion of wrongdoing"). The questioning was persistent and not merely "investigatory." See Commonwealth v. Kirwan, 448 Mass. 304, 311 (2007). Officer Camara's focus on gathering physical evidence from the defendant also indicates

---

[8] Officer Camara first asked the defendant, "[W]hy are you running up towards this gentleman and saying that you're going to kick in his door?" He then asked whether either of the knives on the ground belonged to the defendant and where the blood on the defendant's sneakers came from.

that his inquiry exceeded general investigatory questioning. Cf. Commonwealth v. Merritt, 14 Mass. App. Ct. 601, 604 (1982) (no Miranda warnings required for "[g]eneral on-the-scene questioning" [citation omitted]).  Officer Camara "expressed disbelief in response to [the defendant's] answers."[9] Commonwealth v. Medina, 485 Mass. 296, 303 (2020).  Surrounded by the police, seated in handcuffs, and held for thirty to forty-five minutes, the defendant was clearly not free to end the interview and leave at the time he made the statements at issue.[10]  See Earl, supra at 674-675 (defendant was not free to leave where officers used force to prevent defendant from running away and did not leave his side or remove handcuffs). Because the defendant was in custody and was not given Miranda warnings, his statements should have been suppressed.

b.  Sneakers.  The defendant likewise contends that his sneakers should have been suppressed because he did not consent to their seizure.  In response, the Commonwealth contends that the defendant's act of kicking off his sneakers in response to the officer's request that the defendant give the sneakers to

_____

[9] After asking the defendant more questions about his sneakers, Officer Camara stated, "You know what, Scott?  I don't believe a word you're telling me with the sneakers."

[10] The defendant was released at the end of the questioning and formally arrested on October 5, 2017, four days after the incident.

him, constituted consent. "A search [or a seizure] conducted with the consent of its subject is free of the strictures of the Fourth Amendment and art. 14." Commonwealth v. Blais, 428 Mass. 294, 298 (1998). "Voluntariness of consent is a question of fact to be determined in the circumstances of each case. . . . As a question of fact, it should not be reversed absent clear error by the judge" (quotations and citations omitted). Commonwealth v. Buckley, 478 Mass. 861, 875 (2018).

The question is controlled in material respects by Commonwealth v. Martin, 444 Mass. 213, 215 (2005). In that case, the Supreme Judicial Court adopted "a common-law rule . . . [that physical] evidence, if derived from unwarned statements where Miranda warnings would have been required by Federal law in order for them to be admissible, is presumptively excludable from evidence at trial as 'fruit' of the improper failure to provide such warnings." Id.

"The Supreme Court has recognized two exceptions to the fruit of the poisonous tree doctrine." Commonwealth v. Benoit, 382 Mass. 210, 215-216 (1981). "Evidence is not excluded under the doctrine if (1) the government obtained it through an independent source, . . . or (2) the connection [between the improper conduct and the derivative evidence has] become so attenuated as to dissipate the taint" (quotations and citations omitted). Id. at 216. "In determining whether evidence derived

from an illegal search or seizure must be suppressed, . . . [the issue is whether] the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint" (quotations and citation omitted). Commonwealth v. Fredericq, 482 Mass. 70, 78 (2019).

In the present case there is no serious question that the officer's request for the sneakers, and the defendant's acquiescence in that request, were a product of the unwarned custodial interrogation. Indeed, the defendant's surrender of the sneakers was the culmination of an increasingly skeptical and confrontational turn in the officer's questioning of him.[11] Nor has the Commonwealth established either that it obtained the evidence through an independent source, or that the connection between the improper interrogatory conduct and the derivative evidence was sufficiently attenuated to dissipate the taint.

Because the sneakers were fruit of an unwarned custodial interrogation of the defendant, the denial of the defendant's motion to suppress their admission in evidence at trial was error.

c. Prejudice. "The question remains whether the improper admission of the [evidence obtained during the unwarned

_____

[11] See note 8, supra.

interrogation] was harmless beyond a reasonable doubt." Earl, 102 Mass. App. Ct. at 678.

When analyzing whether an error was harmless beyond a reasonable doubt, "we ask whether, on the totality of the record before us, weighing the properly admitted and the improperly admitted evidence together, we are satisfied beyond a reasonable doubt that the tainted evidence did not have an effect on the jury and did not contribute to the jury's verdicts." Commonwealth v. Tyree, 455 Mass. 676, 701 (2010). "Factors the court considers in determining whether the erroneous admission of particular evidence is harmless include the importance of the evidence to the prosecution's case as well as to the premise of the defense; the frequency of reference to that evidence; and the weight of evidence of the defendant's guilt." Commonwealth v. Molina, 467 Mass. 65, 79 (2014).

Though there may be some question concerning the weight or significance of the defendant's statements in the jury's assessment of his guilt,[12] the significance of the sneakers -- and more precisely the blood on them matching the blood of the

_____

[12] In the statements at issue, the defendant denied his guilt. He stated that he was running back to his friend's house to call the police because he saw the victim on the ground and a male and a female running west on Bedford Street. And when Officer Camara asked about the blood on the defendant's sneakers, the defendant said that he had cut himself earlier and that it was his own blood.

victim -- was powerfully inculpatory in connecting the defendant to the fatal assault against the victim.  Other than the match between the victim and the blood found on the defendant's sneakers, the evidence supporting the defendant's identity as the victim's attacker was not particularly strong.  Neither witness to the assault made an in-court identification.  Both witnesses had obstructed views, and their respective out-of-court viewings of the defendant on the curb surrounded by the police involved sufficient suggestiveness that they are of questionable weight.  By contrast, the DNA match between the victim and the blood found on the defendant's sneakers strongly established the defendant as the perpetrator of the assault.  We conclude that the conviction cannot stand.

2.  Other issues.  Because the defendant's other claims of error are unlikely to recur in any new trial that may proceed, we address them only briefly.  It was improper for the prosecutor to refer in closing argument to the worth of the victim's life and to argue that he did not deserve to die,[13] and we expect that the trial prosecutor in any future trial of the

---

[13] The prosecutor argued that "[the victim] may have had his own crosses to bear.  He certainly had a high blood alcohol at the time of his death.  That does not mean that his life was without worth or that he deserved to die the way that he did."

defendant will not commit the same impropriety.[14]  See

Commonwealth v. Rutherford, 476 Mass. 639, 646 (2017)

(impermissible for prosecutor to argue what defendant thought

victim's life was worth); Commonwealth v. Gentile, 437 Mass.

569, 580 (2002) (improper for prosecutor to state that victim

"didn't deserve to die this way").  The defendant's claim of

error in the humane practice instruction is even less likely to

recur, as it appears to have been an obvious slip of the tongue

by the trial judge in administering the charge to the jury.[15]

Conclusion.  The denial of the defendant's motions to

suppress his statements and physical evidence is reversed.  The

judgment is vacated and the verdict set aside.  The case is

remanded to the Superior Court for entry of an order allowing

the defendant's motions to suppress and for such further

proceedings as may be appropriate.

So ordered.

---

[14] The Commonwealth conceded in its brief and at oral argument that "the prosecutor ought to have avoided phrasing her remarks that way."

[15] In her humane practice instruction, the trial judge stated, "You may not consider any such statement in your deliberations unless, from all of the evidence in this case, the Commonwealth has proved beyond a reasonable doubt that the defendant made the statement that he or she is alleged to have made and that the statement is involuntary" (emphasis added). The judge's written instructions (which the jury carried into their deliberations) correctly stated that the Commonwealth was required to prove that the statement was voluntary.