SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. MANUEL DIAZ

 
 Docket:
 SJC-13635
 
 
 Dates:
 January 6, 2025 – June 27, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Dewar, & Wolohojian, JJ.
 
 
 County:
 Hampden
 

 
 Keywords:
 Controlled Substances. Search and Seizure, Motor vehicle, Fruits of illegal search, Presumptions and burden of proof. Constitutional Law, Search and seizure, Equal protection of laws, Burden of proof. Practice, Criminal, Presumptions and burden of proof, Motion to suppress.
 
 

 Indictment found and returned in the Superior Court Department on February 14, 2018.
 A pretrial motion to suppress evidence was heard by Francis E. Flannery, J.; a motion for reconsideration was also heard by him; and a conditional plea of guilty was accepted by Karen L. Goodwin, J.
 The Supreme Judicial Court granted an application for direct appellate review.
 John P. Warren for the defendant.
 Travis H. Lynch, Assistant District Attorney, for the Commonwealth.
 Katharine Naples-Mitchell & Claudia Leis Bolgen, for the Criminal Justice Institute at Harvard Law School & another, amici curiae, submitted a brief.
 GAZIANO, J.  After two evidentiary hearings, a judge of the Superior Court found that the defendant, Manuel Diaz, was subjected to an unlawful traffic stop in violation of both his right to be free from unreasonable searches and seizures under art. 14 of the Massachusetts Declaration of Rights and his right to equal protection under arts. 1 and 10 of the Massachusetts Declaration of Rights.  Upon being stopped, the defendant fled in his car at a high rate of speed, lost control of the car, and fled into the woods on foot.  Drugs were subsequently found on his flight path.  Thereafter, the defendant was charged with trafficking cocaine, and his motion to suppress the drugs and evidence of identity obtained from his car was denied.  At issue is whether this evidence should have been suppressed under the exclusionary rule or admitted under the exclusionary rule's attenuation exception.  For the following reasons, we conclude that the attenuation exception does not apply as to either the art. 14 violation or the violation of arts. 1 and 10.  We therefore reverse the motion judge's denial of the defendant's motion to suppress.[1]
 1.  Background.  We summarize the facts as found by the motion judge, supplemented by uncontroverted evidence that the judge explicitly or implicitly credited.  See Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007), S.C., 450 Mass. 818 (2008).
 At an evidentiary hearing held on April 2, 2019, Officer Mark Shlosser of the Wilbraham police department testified that on August 5, 2017, at approximately 9:30 P.M., he was driving a marked cruiser on Springfield Street in Wilbraham when his attention was drawn to a gray sedan.  According to Shlosser, the sedan appeared to be traveling in excess of the posted speed limit at sixty miles per hour, and Shlosser's radar unit confirmed as much once activated.  Shlosser testified that he then switched on his cruiser's blue lights and pulled over the sedan.
 The motion judge noted a number of inconsistencies between Shlosser's testimony and the video, audio, and global positioning system (GPS) evidence introduced at the evidentiary hearing.  Because of these inconsistencies as well as Shlosser's general confusion and lack of memory, the motion judge concluded that he could not credit "Shlosser's explanation and justification for the stop of the sedan."  At the same time, the motion judge did not find sufficient evidence at this stage to adopt the defendant's explanation that Shlosser stopped the sedan because its operator (the defendant) was Black.
 Dashboard camera video footage taken from Shlosser's cruiser captured what followed immediately after the stop.  After Shlosser approached the defendant's vehicle on foot, the defendant drove off at a high rate of speed.  Shlosser re-entered his cruiser and pursued the defendant.  Shortly thereafter, the sedan can be seen on a grassy area adjacent to the roadway and the defendant can be seen running across the roadway into a wooded area.  From this, the motion judge inferred that the defendant lost control of the vehicle.  Altogether, approximately fifty-eight seconds elapsed between when the sedan was stopped and when it was driven off the road, and approximately thirty-six seconds elapsed between the sedan being driven off the road and the defendant running into the woods.  The motion judge inferred that a bag of cocaine, subsequently recovered on the path the defendant took as he fled into the woods on foot, was discarded by the defendant.  Before the defendant's vehicle was removed from the crash site, an inventory search of the car yielded documents that were used by the police to identify the defendant, who had not yet been apprehended, as the driver.
 On March 23, 2018, the defendant was arraigned in the Superior Court on one count of trafficking in 200 grams or more of cocaine, in violation of G. L. c. 94C, § 32E (b) (4).  On February 20, 2019, the defendant filed a motion to suppress.  After conducting the evidentiary hearing, the motion judge denied the defendant's motion to suppress on October 28, 2019, concluding that (1) the Commonwealth failed to justify the stop under art. 14 or the Fourth Amendment to the United States Constitution, but that (2) the defendant's flight from that stop was "abrupt[]" and "reckless under almost any standard" and therefore was a sufficiently independent intervening act to trigger the attenuation exception to the exclusionary rule.  The judge also determined that the defendant violated G. L. c. 90, § 25 (refusal to submit to police officer).
 The defendant subsequently filed a motion to reconsider the suppression ruling.  After we decided Commonwealth v. Long, 485 Mass. 711 (2020), the motion judge requested that the parties file further memoranda addressing the implications of Long for the defendant's motion to suppress.  Following an evidentiary Long hearing, the motion judge issued a written decision on July 26, 2022, denying the defendant's motion to reconsider the order denying the motion to suppress.  He found that Shlosser's testimony at the second hearing "did not disabuse [him] of [his] general impression of Shlosser as a witness . . . which is that [Shlosser's] memory of the relevant events of that evening is unreliable."  Ultimately, the motion judge concluded that (1) the Commonwealth had failed to rebut the inference, established by the defendant, that the stop was motivated at least in part by the defendant's race, but that (2) the attenuation exception to the exclusionary rule still applied.
 After entering a conditional plea of guilty to a lesser charge of trafficking in thirty-six to one hundred grams of cocaine in May 2023, the defendant timely appealed from the denial of his motion to suppress.  We granted the defendant's application for direct appellate review.
 2.  Discussion.  This case presents two issues.  First, accepting that the traffic stop of the defendant violated his art. 14 right to be free from unreasonable searches and seizures, does the attenuation exception to the exclusionary rule apply as to this violation?  Second, accepting that the traffic stop of the defendant also violated his right to equal protection under arts. 1 and 10, does the attenuation exception to the exclusionary rule apply as to this violation?  Because both questions turn on the "application of constitutional principles to the facts found," we "review independently" the motion judge's determinations with respect to attenuation (citation omitted).  Commonwealth v. Mauricio, 477 Mass. 588, 591 (2017).
 We begin with first principles.  "The suppression of evidence under the exclusionary rule is a 'judicially created remedy,' whose 'prime purpose is to deter future unlawful police conduct.'"  Commonwealth v. Lora, 451 Mass. 425, 438 (2008), quoting United States v. Calandra, 414 U.S. 338, 347, 348 (1974).  Another purpose is to "preserve judicial integrity by disassociating the courts from unlawful [police] conduct" (citation omitted).  Commonwealth v. Long, 476 Mass. 526, 536 (2017).  To serve its function, the exclusionary rule provides that "evidence seized during an unlawful search [cannot] constitute proof against the victim of the search."  Wong Sun v. United States, 371 U.S. 471, 484 (1963).  As discussed infra, in Massachusetts the exclusionary rule protects against both unreasonable searches and seizures (art. 14) and equal protection violations (arts. 1 and 10).  See Commonwealth v. Fredericq, 482 Mass. 70, 78 (2019) (exclusionary rule prohibits "the use of evidence derived from an unconstitutional search or seizure"); Lora, supra at 426 ("evidence seized in the course of a stop violative of equal protection should, ordinarily, be excluded at trial").  Whatever its constitutional grounds, the fundamental policy underlying the exclusionary rule is the same:  "to deter police misconduct and preserve judicial integrity by dissociating courts from unlawful conduct."  Commonwealth v. Nelson, 460 Mass. 564, 570-571 (2011).
 Of course, the exclusionary rule is not cost-free.  Because it suppresses otherwise admissible evidence of criminal activity, its practical application must strike a balance between the "goal[] of deterring official misconduct," Commonwealth v. Caso, 377 Mass. 236, 244 (1979), and the "competing societal interest in convicting the guilty," Commonwealth v. Benoit, 382 Mass. 210, 216 (1981), S.C., 389 Mass. 411 (1983).  Accordingly, applying the attenuation exception requires "attempt[ing] to determine the point of diminishing returns at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its costs."  Long, 476 Mass. at 536.
 In determining whether the attenuation exception applies, the question is not whether "the illegal actions of the police" were a "but for" cause of the evidence being found.  Wong Sun, 371 U.S. at 487-488.  Rather, the question is whether the evidence for which suppression is sought "has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint" (citation omitted).  Id. at 488.  To answer that question in the art. 14 context, we consider three factors:  "(1) the temporal proximity of the [unlawful conduct] to the defendant's response; (2) the presence or absence of intervening circumstances; and (3) the purpose and flagrancy of the misconduct."  Commonwealth v. Borges, 395 Mass. 788, 795-796 (1985).  Further, "[i]t is the Commonwealth's burden to establish that the evidence it has obtained and intends to use is sufficiently attenuated from the underlying illegality so as to be purged from its taint."  Commonwealth v. Damiano, 444 Mass. 444, 454 (2005).  See Commonwealth v. Fredette, 396 Mass. 455, 459 (1985) (Commonwealth "bears the [heavy] burden" of "proving that evidence subsequently obtained [after illegality] is untainted").
 a.  The art. 14 violation.  We now apply the three factors articulated in Borges to the art. 14 violation in this case.  In brief, the first and third factors clearly weigh against attenuation, and the second factor weighs narrowly against attenuation.
 The first factor, temporal proximity, weighs against attenuation.  As noted supra, approximately one minute elapsed between when the defendant was pulled over and when he drove off, and less than one minute elapsed between when the defendant drove off and when the defendant ran into the woods via the path on which drugs were recovered.  In other words, "[t]he defendant attempted to flee moments after the illegal [stop]" and "attempted disposal of the evidence quickly followed."  Borges, 395 Mass. at 796 (finding "close temporal proximity between the illegal arrest and the defendant's response").  See Brown v. Illinois, 422 U.S. 590, 604-605 (1975) ("less than two hours" between illegal arrest and challenged statement counted against attenuation); United States v. Terry, 909 F.3d 716, 721 (4th Cir. 2018) ("a mere two days" between unlawful placement of GPS tracker and discovery of drugs was "an insubstantial amount of time" in context of attenuation analysis).  Indeed, the Commonwealth has not purported to show that the first factor supports attenuation.
 The third factor, purpose and flagrancy, also weighs clearly against attenuation.  When weighing this factor, "we ask, first, whether the police performed the illegal act for the purpose of obtaining the evidence that the defendant seeks to suppress, and second, whether the police knew that their actions were illegal but proceeded anyway."  Long, 476 Mass. at 537-538.  The motion judge concluded that "the reason for [the stop is] a mystery."  The source of that "mystery" was the motion judge's refusal to "credit . . . Shlosser's testimony concerning the stop" in light of multiple inconsistencies and failures of recollection.  Because there is no credible explanation for the stop, Shlosser's knowledge and motivation with respect to the stop also remain a "mystery."  However, that "mystery" does not redound to Shlosser's benefit.  On the contrary, lack of credibility on the part of the officer who conducted the challenged stop itself supports an inference of purpose and flagrancy in the art. 14 context.  Compare United States vs. Marshall, U.S. Dist. Ct., No. 07-CR-153 (E.D. Wis. Jan. 14, 2008) (determining that officers' actions were "purposeful and flagrant" due to "serious concerns about the officers' credibility" and fact that they "arbitrarily and illegally stopp[ed] the defendant for a reported failure to stop at a stop sign when no stop sign existed"), with United States vs. Chischilly, U.S. Dist. Ct., No. CR 05–1115 PCT DGC (D. Ariz. Apr. 25, 2006) (determining that officer's arrest of defendant was "[n]either flagrant [n]or for an improper purpose" where "[c]ourt found [officer's] testimony to be credible and conclude[d] that he was acting in good faith when he arrested [d]efendant").  Just as "[w]e do not recognize a 'good faith' exception to either the exclusionary rule or the attenuation [exception]," Fredericq, 482 Mass. at 84, lack of credibility on Shlosser's part supports a finding of purpose and flagrancy.  In sum, the third factor counts against attenuation.
 The second factor, intervening circumstances, presents a closer question.  As a threshold matter, a defendant's flight and attempted disposal of the evidence do not automatically constitute an intervening act.  See Borges, 395 Mass. at 796 ("Although, in the present case, the defendant attempted both to flee and to dispose of evidence, . . . [these acts] cannot be considered independent and intervening acts").  Nor does a defendant's refusal to submit to a police officer followed by "reckless" driving, even to the extent that such conduct was criminal.  See Commonwealth v. Martin, 457 Mass. 14, 22 (2010) (defendant's act of pushing officer's hands away not "a 'new' intervening crime [of assault and battery on a police officer] which dissipated any causal link between the officer's conduct and the discovery of the [evidence]" [quotation omitted]).  Rather, the question is whether a defendant's conduct is more accurately seen as a "new, unrelated crime" or instead as a "direct and immediate response to the illegal police action" (quotation omitted).  Borges, supra at 796-797.
 On balance, we conclude that the Commonwealth has failed to demonstrate that the second factor supports attenuation in this case.  First, the record strongly suggests that the defendant's thirty-six second automotive flight was indeed a "direct and immediate response" to being illegally stopped.  Borges, 395 Mass. at 796.  Among other things, although temporal proximity and intervening circumstances are distinct factors, the former can shed light on the latter insofar as a defendant's conduct that immediately follows illegal police action is more likely to be responsive thereto.  Id. ("because of the close temporal proximity of these events to each other and to the illegal act of the police officers, [defendant's attempted flight and evidence disposal] cannot be considered independent and intervening acts").  Second, when viewed as a whole, the illegal stop, flight, and attempted evidence disposal are more plausibly construed as a single "entangled" nexus than as a sequence of distinct and independent events.  United States v. Waide, 60 F.4th 327, 340 (6th Cir. 2023) (destruction of evidence was not intervening circumstance where it was undertaken "for [no] reason other than the imminent threat of unlawful police [conduct]," such that defendant's actions "were entangled" with that conduct).  Compare Commonwealth v. King, 389 Mass. 233, 245 (1983) ("driver's independent and intervening action of [shooting at] the troopers . . . broke the chain of causation and dissipated the taint of the prior illegality"), with Commonwealth v. O'Laughlin, 25 Mass. App. Ct. 998, 999-1000 (1988) (defendant's "[driving] off at such a high rate of speed that his tires were squealing" and subsequent discarding of jacket containing heroin was "an immediate and direct result" of illegal attempted stop [citation omitted]).
 Taken as a whole, the three factors militate against application of the attenuation exception to the exclusionary rule.  It follows that as to the art. 14 violation, the Commonwealth failed to carry its burden of showing that "the detrimental consequences of illegal police action [have] become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its costs."  Long, 476 Mass. at 536.
 b.  The equal protection violation.  Our determination that the attenuation exception does not apply with respect to the art. 14 violation does not automatically resolve whether it applies to the violation of arts. 1 and 10.  See Commonwealth v. Robinson-Van Rader, 492 Mass. 1, 22 (2023) ("State constitutional guarantees of equal protection . . . [are] separate and distinct from the prohibition against unreasonable searches and seizures under . . . art. 14").  Accordingly, we will separately analyze the applicability of the attenuation exception to Shlosser's unlawful stop when that stop is seen through the lens of equal protection.
 As mentioned supra, violations of a defendant's equal protection rights under the Massachusetts Declaration of Rights presumptively trigger application of the exclusionary rule.  Lora, 451 Mass. at 426 ("evidence seized in the course of a stop violative of equal protection should, ordinarily, be excluded at trial").  This reflects our judgment that such application is "entirely consistent with the policy underlying the exclusionary rule, is properly gauged to deter intentional unconstitutional behavior, and furthers the protections guaranteed by the Massachusetts Declaration of Rights."  Id. at 439.  In articulating that judgment, we have also provided for application of the attenuation exception to the exclusionary rule as and when appropriate:  "if a defendant can establish that a traffic stop is the product of selective enforcement predicated on race, evidence seized in the course of the stop should be suppressed unless the connection between the unconstitutional stop by the police and the discovery of the challenged evidence has 'become so attenuated as to dissipate the taint.'"  Id. at 440, quoting Wong Sun, 371 U.S. at 487-488.  However, we have not yet had occasion to explicitly consider how the attenuation exception applies when the exclusionary rule is triggered by an equal protection violation.
 In considering that question, we find no reason to depart from the three-factor test that has guided our application of the attenuation exception in the art. 14 context.  That three-factor test effectuates the balance between the rationales underlying the exclusionary rule -- that is, deterrence, Lora, 451 Mass. at 438, and preservation of judicial integrity, Long, 476 Mass. at 536 -- and the competing societal interest in convicting the guilty, Benoit, 382 Mass. at 216.  The societal interest in convicting the guilty is not inherently any stronger or any weaker with respect to crimes for which evidence was obtained in violation of equal protection as compared to crimes for which evidence was obtained in violation of art. 14.  Therefore, if applying the exclusionary rule to equal protection violations is justified by virtue of being "entirely consistent" with "the policy underlying the exclusionary rule," Lora, 451 Mass. at 439, then it stands to reason that the appropriate test for setting the limits of the exclusionary rule marked by the attenuation exception is the three-factor test articulated in Borges, 395 Mass. at 795-796.  Accordingly, we again evaluate "(1) the temporal proximity of the [unlawful conduct] to the defendant's response; (2) the presence or absence of intervening circumstances; and (3) the purpose and flagrancy of the misconduct."  Id.
 The first factor applies no differently as to the equal protection violation.  Less than two minutes elapsed between the defendant being stopped in violation of his art. 14 right to be free from unreasonable searches and seizures and his attempt to flee into the woods and dispose of the evidence.  And less than two minutes elapsed between the defendant being stopped in violation of his right to equal protection under arts. 1 and 10 and his attempted flight and evidence disposal.  Likewise, the second factor does not apply differently as to the equal protection violation.  The defendant's conduct was a "direct and immediate response" to one action:  Shlosser's unlawful stop of the defendant's vehicle.  Borges, 395 Mass. at 796.  As such, just as the defendant's responsive conduct narrowly counts against attenuation as to the art. 14 violation embodied in Shlosser's action, so too does it narrowly count against attenuation as to the equal protection violation embodied in that same action.
 By contrast, the third factor does apply differently to Shlosser's conduct when viewed through the lens of equal protection.  Recall that in the art. 14 context, the purpose and flagrancy inquiry is guided by two questions:  "first, whether the police performed the illegal act for the purpose of obtaining the evidence that the defendant seeks to suppress, and second, whether the police knew that their actions were illegal but proceeded anyway."  Long, 476 Mass. at 537-538.  In the equal protection context, however, these questions are not reliable guides to purpose and flagrancy.  This is so for two reasons.
 First, the fact that a stop was motivated by the objective of obtaining evidence is not a reliable indicator of purpose and flagrancy from an equal protection standpoint.  For example, a traffic stop motivated by the desire to detain and harass a motorist because of his or her race would be flagrant whether or not it was accompanied by the collateral objective of obtaining incriminating evidence.  Second, the prevalence of implicit bias means that many officers who conduct traffic stops in whole or in part because of the defendant's race will not "kn[o]w that their actions [a]re illegal [and will] proceed[] anyway."  Long, 476 Mass. at 538.  Nevertheless, "where there is no legitimate justification for a given instance of selective enforcement, . . . [such enforcement] should violate . . . equal protection [rights] regardless of whether the [officer] knew he was abusing his office" (quotation and citation omitted).  Long, 485 Mass. at 734.  See Commonwealth v. McCowen, 458 Mass. 461, 499 (2010) (Ireland, J., concurring) ("people possess [implicit racial biases] over which they have little or no conscious, intentional control" [quotation and citation omitted]).  Because implicit bias is by definition unconscious, an interpretation of the purpose and flagrancy factor requiring judges to determine in each case whether a stop was motivated by explicit bias or implicit bias -- and to assign less weight to the latter than to the former -- would be counterproductive.  In short, although the two-step inquiry articulated in Long, 476 Mass. at 537-538, is an appropriate framework for analyzing purpose and flagrancy in the art. 14 context, it is not a reliable guide to purpose and flagrancy in the equal protection context.
 To clarify the third factor in the equal protection context, we must revisit the "heart of the equal protection [guarantee]," which is "its prohibition of discriminatory treatment" (citation and alterations omitted).  Robinson-Van Rader, 492 Mass. at 23.  In contrast to the art. 14 protection against unreasonable searches and seizures, which hinges on a concept of "reasonableness" that comes in degrees, no degree of racial motivation in traffic enforcement is acceptable from an equal protection standpoint.  "[U]nlike art. 14, our equal protection doctrine provides a clear definition of an unlawful traffic stop:  any stop based on a suspect classification" (emphasis added).  Long, 485 Mass. at 730.  Indeed, an equal protection violation occurs whenever "the stop was motivated at least in part by race" (emphasis added).  Id. at 726.
 Furthermore, we "have expressed considerable concern about the practice of racial profiling" in the specific context of traffic enforcement.  Lora, 451 Mass. at 444.  Simply put, "[a] motorist must never be stopped based on his or her race or ethnicity without legally sufficient cause."  Commonwealth v. Feyenord, 445 Mass. 72, 88 (2005) (Greaney, J., concurring), cert. denied, 546 U.S. 1187 (2006).  For that reason, "[t]his court has identified the discriminatory enforcement of traffic laws as [a] particularly toxic" and "persistent and pernicious problem."  Long, 485 Mass. at 715, 717.  Nor are we alone in that recognition.  See, e.g., United States v. Montero-Camargo, 208 F.3d 1122, 1135 (9th Cir.), cert. denied sub nom. Sanchez-Guillen v. United States, 531 U.S. 889 (2000) ("Stops based on race or ethnic appearance send the underlying message to all our citizens that those who are not white are judged by the color of their skin alone"); State v. Segars, 172 N.J. 481, 493 (2002) ("The rationales that support the suppression of evidence . . . apply equally, if not more so, to cases of racial targeting").
 Because of the recognized gravity of racially selective traffic enforcement, and the fact that no "amount" of racial motivation in traffic enforcement is compatible with equal protection, racially selective traffic enforcement violative of equal protection is inherently flagrant under the Borges test.  To be clear, this conclusion does not displace an inquiry into the three attenuation factors.  And it certainly does not imply that the attenuation exception has no application in the equal protection context; after all, the third factor is "not dispositive," Fredericq, 482 Mass. at 84, and as such can be outweighed by the other two.  What this holding does foreclose is the possibility of a racially selective traffic stop that both violates the defendant's equal protection rights and does not count as "flagrant" under the Commonwealth's attenuation jurisprudence.  To countenance such a possibility, we would have to disavow our recognition that this specific type of police misconduct is a "particularly toxic" and "pernicious" constitutional problem.  Long, 485 Mass. at 715, 717.  That we decline to do.
 In sum, the first and second factors do not apply any differently to the equal protection violation.  As with the art. 14 violation, the first factor clearly weighs against attenuation, and the second factor narrowly weighs against attenuation.  However, the third factor weighs more strongly against attenuation as to the equal protection violation than it does as to the art. 14 violation because of the inherently flagrant nature of racially selective traffic enforcement.  Overall, the "taint" of the equal protection violation did not "dissipate" (citation omitted).  Wong Sun, 371 U.S. at 487.  It follows that the Commonwealth did not carry its burden of proving attenuation as to the equal protection violation.
 3.  Conclusion.  Shlosser's traffic stop violated the defendant's art. 14 right to be free from unreasonable searches and seizures and the defendant's right to equal protection under arts. 1 and 10.  As such, it triggered the presumptive application of the exclusionary rule to evidence of drugs found on the path of the defendant's flight and to evidence subsequently discovered in the defendant's car.  Furthermore, the Commonwealth failed to meet its heavy burden of demonstrating that either violation of the defendant's rights was sufficiently attenuated from the recovery of the evidence to overcome suppression.  We therefore reverse the order denying the defendant's motion to suppress.
 So ordered.

footnotes
 [1] We acknowledge the amicus brief submitted by the Criminal Justice Institute at Harvard Law School and the Massachusetts Association of Criminal Defense Lawyers in support of the defendant.